IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| RAYMOND FARZAN | : | CIVIL ACTION |
| | : | |
| v. | : | No. 13-2898 |
| | : | |
| THE VANGUARD GROUP, INC. | : | |

**MEMORANDUM**

**Juan R. Sánchez, J.**                                                                                            **January 10, 2014**

      Plaintiff Raymond Farzan brings this employment discrimination action against his former employer, Defendant The Vanguard Group, Inc. (Vanguard), alleging violations of Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. § 2000e et seq., the Pennsylvania Human Relations Act (PHRA), 43 Pa. Stat. Ann. §§ 951-963, and the Age Discrimination in Employment Act of 1967 (ADEA), 29 U.S.C. §§ 621-634.  Farzan alleges he was subjected to a hostile work environment and unlawfully terminated because of his sex, race, religion, national origin, and age, and in retaliation for threatening to file a complaint if anything happened to his position.[1]  On November 4, 2013, Vanguard moved for summary judgment on all counts of Farzan's Complaint.  Because there are no genuine disputes as to any material facts and because Vanguard is entitled to judgment as a matter of law, Vanguard's motion for summary judgment will be granted.

---

[1] Born in 1950 in Iran, Farzan is a Muslim of Arab descent.  Although he is proceeding pro se in this case, he presumably has some familiarity with the legal system, having filed employment discrimination complaints against each of his five previous employers.

**FACTS**

In the fall of 2011, Joseph Corcoran, a Vanguard employee, received approval from the company's Project Management Office to engage an outside contractor to fill the position of a "senior" business systems analyst (BSA) to be staffed on certain temporary projects run by Corcoran. Vanguard then contacted LiquidHub, Inc., an information technology consulting company, to fill the position.[2] LiquidHub referred Farzan to Vanguard as a potential candidate, and after a series of interviews at Vanguard, including an in person interview with Corcoran, Corcoran selected him for the assignment. Farzan was then hired by LiquidHub as a temporary employee staffed on the Vanguard project.[3]

Farzan began working as a senior BSA at Vanguard on January 3, 2012, with Corcoran as his immediate supervisor. According to Farzan, the primary role of a BSA is to collect the requirements of certain business users using the template and methodologies offered at the company and to translate those requirements into another document using a template provided by the company. A senior BSA should be able to perform all the responsibilities of the position with minimal supervision. *See* Def.'s Mot. for Summ. J. Ex. N (November 21, 2011, email from LiquidHub to Farzan explaining responsibilities were to be completed under "minimal direction" and "minimal supervision"). These responsibilities included, among other things, "lead[ing] requirements gathering sessions . . . for multiple projects independently." *Id.* Farzan was

---

[2] Farzan asserted the same claims against LiquidHub, which filed a separate motion for summary judgment on all counts. By Order of December 19, 2013, this Court granted LiquidHub's motion and dismissed Farzan's claims against the company with prejudice.

[3] Vanguard did not challenge Farzan's status as an employee for the purposes of its summary judgment motion. The Court will therefore analyze Farzan's claims assuming, without deciding, that he was a Vanguard employee at all relevant times.

assigned to two projects, the SSTLM project and the AWD project, and was the only Iranian in each group.

During the approximately four months Farzan was employed as a BSA at Vanguard, he received direction and feedback from various individuals, including, among others, Corcoran, Kathy Richter, a business manager associated with the SSTLM project, and Monique Peay, a fellow BSA who also served as Farzan's mentor. Richter, Peay, and others at Vanguard also provided feedback to Corcoran regarding Farzan's performance. By late March 2012, Corcoran became concerned with Farzan's performance and had notified LiquidHub of his concerns. In response, Jeffery Fountaine, a LiquidHub client manager, paired Farzan with another LiquidHub employee with BSA experience at Vanguard to serve as an additional mentor, but Vanguard remained dissatisfied with Farzan's work.

One of Corcoran's central concerns regarding Farzan's performance was his failure to effectively lead the project meetings, which is an expectation and job requirement of a senior level BSA. Others echoed and reinforced this concern, including Richter, who often took the lead during project meetings even though the responsibility for doing so lay with Farzan. *See* Def.'s Mot. for Summ. J. Ex. R (April 3, 2012, email from Peay to Corcoran summarizing her concerns regarding Farzan's performance); *see also* Corcoran Dep. 28 (explaining Richter's frustration that Farzan was not leading the meetings). While Farzan contends that Richter insisted on doing his job, Corcoran advised him in mid-March that he should be "very aggressive" in dealing with Richter's team and encouraged Farzan to take the lead. Farzan Aff. ¶¶ 58, 67. Peay also agreed that Farzan was not running the meetings as he should, and she informed both Farzan and Corcoran of this concern. *Id.* ¶ 64.

Those familiar with Farzan's work raised other issues aside from his failure to lead the project meetings. Peay informed Corcoran that, in general, she did not feel Farzan was operating at a senior BSA level. In addition to a lack of leadership, Peay found Farzan's work product was often inaccurate and incomplete, and he did not appear to have adequately planned and prepared for meetings. Richter also provided negative feedback about Farzan to Corcoran, finding Farzan's work execution substandard, highlighting his failure to effectively document and follow up on action items at meetings. George Gray, a manager of the AWD project, told Corcoran that Farzan had missed meetings and was not keeping the schedule for the overall project. Andy Harper, another Vanguard employee, reported that since Farzan's involvement on the projects, there was "no output that could be verified. . . . no deliverables being produced." Harper Dep. 15.

In an effort to address these concerns with Farzan directly, Corcoran scheduled several meetings with him via email invitation, which Farzan declined without explanation. Farzan maintains the declined invitations were the result of a technical error in his email client, which was later addressed. Shortly after declining the meetings, Farzan received what he describes as an "angry and insulting" voicemail from Corcoran. Farzan Aff. ¶ 60. In it, Corcoran expressed his frustration for Farzan's nonresponsiveness and decision to decline without explanation a meeting suggested by Corcoran to address Farzan's performance issues. In addition to contacting Farzan directly, Corcoran contacted Peay to encourage her to continue working with Farzan as a mentor to help improve his performance. *See* Pl.'s Resp. Ex. 22; Corcoran Dep. 24. To that end, Peay provided constructive feedback to Farzan with tips on improving his leadership and attention to detail. *See* Pl.'s Resp. Ex. 23. When advising Farzan to improve his turnaround

4

time regarding certain documents, Peay referred to Richter's team as "a demanding bunch." Pl.'s Resp. Ex. 13.[4]

Corcoran made the decision to terminate Farzan's assignment and on April 18, 2012, informed LiquidHub of Farzan's removal from the project. He based his decision on his own observations and feedback he received from other Vanguard employees regarding Farzan's performance. Farzan's position was temporarily filled internally by a Vanguard employee named Mallary Cosfol, and later in November 2012, Vanguard retained Gurpreet Jaswal, an outside contractor, as a permanent replacement on the project. Def.'s Mot. for Summ. J. Ex. K (Answer to Interrogatory 21). On April 23, 2012, Fountaine emailed Farzan and, referring to Corcoran's decision to remove Farzan from the project at Vanguard and fill the position internally, wrote "Based on that I wonder if he was just coming up with junk excuses to end the contract." Def.'s Mot. for Summ. J. Ex. W. Fountaine had no personal experience as a BSA, he was never employed by Vanguard, never attended any meetings where Farzan was present, and did not independently review Farzan's work. Fountaine's beliefs regarding the quality of Farzan's performance at Vanguard were influenced primarily by statements made to him by Farzan.

To support his discrimination claims, Farzan points to certain comments made at various times during his employment as a BSA. When Farzan first started, Corcoran asked Farzan about the origin of his name. Corcoran never again spoke to Farzan about his national origin and Farzan acknowledged he did not find the question insulting. The only allegation implicating Farzan's age discrimination claim involves a statement made by Corcoran to Harper in Farzan's

---

[4] Richter acknowledged her schedule was aggressive and she admitted there was not time to formally train Farzan. *See* Farzan ¶ 49; Pl.'s Resp. Ex. 6. Corcoran testified, however, that because Farzan was hired as a senior level BSA, Vanguard did not expect training would be necessary for him to effectively complete his assigned responsibilities. Corcoran Dep. 19.

5

presence. On a conference call, Corcoran, who was born in 1956, told Harper that he was "older than [Harper] and sometimes [his] brain cells don't function as they should." Farzan Dep. 249. As noted above, Corcoran also encouraged Farzan on multiple occasions to exhibit additional leadership and take on a more pro-active role during project meetings, which Farzan characterizes as harassment.

Around the time Farzan first began at Vanguard, other employees asked about his accent and the origin of his name. Richter once asked Farzan during a meeting about the origin of his given first name Reza and asked why Farzan used the name Ray instead. Richter also commented that she knew someone else with that name. Farzan testified that he felt it was inappropriate in a business meeting to discuss anything personal, but did not find the question insulting. At another meeting involving preventing the use of accounts by terrorists, Richter allegedly looked at Farzan and said "there's no terrorists among us." Farzan Dep. 229.[5] Another Vanguard employee commented before a meeting, when Farzan was testing the connection between projector and laptop, "now you're coming here and learn how to use our equipment and . . . send it back." Farzan Dep. 228. On two other occasions, a coworker named Michelle Cooper allegedly imitated Farzan when he introduced himself to the group before a meeting, provoking laughter.[6] In certain meetings, when Farzan was the only male in the room, he heard laughter from various employees while he was speaking, but did not hear what precipitated the laughter.

---

[5] Richter denied making this comment. Another individual present at the meeting and later deposed by Farzan does not recall her saying it. In addition, Farzan did not mention this comment in his EEOC notice of charge, Complaint, or answers to interrogatories.

[6] Cooper denied this occurred, and other deponents present at the meeting do not recall it ever having occurred.

6

In mid-March 2012, Farzan told Corcoran that "if something happened to my job I would file a complaint." Farzan Aff. ¶ 58; *see also* Farzan Dep. 223. He never told Corcoran, however, that he was experiencing discrimination and intended to file a complaint externally against Vanguard due to that discrimination. Farzan Dep. 224. Farzan made a similar conditional statement to another Vanguard employee, Molly Monaghan. *See id.* at 221. Farzan did tell Fountaine at LiquidHub that he intended to file a discrimination complaint against Vanguard, but Fountaine never told anyone at Vanguard that Farzan told him this. *See* Farzan Aff. ¶ 63; Fountaine Aff. ¶ 3. Farzan filed a charge with the EEOC on June 24, 2012, received his notice of right to bring suit on March 4, 2013, and filed the instant Complaint on May 24, 2013.

**DISCUSSION**

A motion for summary judgment shall be granted "if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Material" facts are those "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A factual dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* "Speculation, conclusory allegations, and mere denials are insufficient to raise genuine issues of material fact." *Boykins v. Lucent Techs., Inc.*, 78 F. Supp. 2d 402, 408 (E.D. Pa. 2000) (citing *Sterling Nat'l Mortg. Co. v. Mortg. Corner, Inc.*, 97 F.3d 39, 45 (3d Cir. 1996), *Groman v. Twp. of Manalapan*, 47 F.3d 628, 633 (3d Cir. 1995), and *Trap Rock Indus., Inc. v. Local 825, Int'l Union of Operating Eng'rs, AFL-CIO*, 982 F.2d 884, 890 (3d Cir. 1992)). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is 'no genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In determining whether to grant summary judgment, the court

"must view the facts in the light most favorable to the non-moving party, and must make all reasonable inferences in that party's favor." *Hugh v. Butler Cnty. Family YMCA*, 418 F.3d 265, 267 (3d Cir. 2005).

Where, as here, there is no direct evidence of discrimination, when evaluating summary judgment motions in the employment discrimination context, the "familiar *McDonnell Douglas* burden shifting analysis applies to [plaintiff's] claims of discrimination under both Title VII and the ADEA." *Sarullo v. U.S. Postal Serv.*, 352 F.3d 789, 797 (3d Cir. 2003) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)). Under this framework, Farzan bears the initial burden of establishing a prima facie case of discrimination. *Id.* (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993)). If he establishes a prima facie case of discrimination, the burden shifts to Vanguard, which must offer sufficient evidence to show a legitimate, nondiscriminatory reason for the adverse action. *Id.* (citing *McDonnell Douglas*, 411 U.S. at 802). If Vanguard meets this burden, the presumption of discriminatory action created by the prima facie case is rebutted, and Farzan must show the articulated reasons were a pretext for discrimination and not the real motivation for the adverse action. *Id.*

Assuming arguendo that Farzan can make out a prima facie case of discrimination,[7] Vanguard has carried its burden to articulate legitimate reasons for his dismissal. Vanguard terminated Farzan because he did not meet the standards expected of a senior level BSA: his

---

[7] To establish a prima facie case under Title VII Farzan must show (1) that he is a member of a protected class; (2) that he was qualified for the position in question; (3) that he was discharged; and (4) that he was terminated "under circumstances that give rise to an inference of unlawful discrimination." *Waldron v. SL Indus. Inc.*, 56 F.3d 491, 494 (3d Cir. 1995). Because Vanguard has focused on Farzan's inability to rebut its articulated reasons for dismissal, this Court will assume, without deciding, that Farzan has made out a prima facie case of Title VII discrimination. Regarding his ADEA claim, because Farzan was replaced by a sufficiently younger person, he has established a prima facie case of age discrimination. *See Showalter v. Univ. of Pitt. Med. Ctr.*, 190 F.3d 231, 234 (3d Cir. 1999).

8

work product was inadequate, he displayed a lack of leadership, and the projects to which he was staffed began to suffer when he was retained. Because Vanguard met its burden to rebut Farzan's prima case, this motion turns on the third stage of the *McDonnell Dougla*s tripartite framework and this Court must determine whether Farzan can satisfy either of the two prongs articulated by the Third Circuit in *Jones v. School District of Philadelphia*, 198 F.3d 403, 413 (3d Cir. 1999). Under *Jones*, to defeat summary judgment by establishing sufficient evidence of pretext, Farzan must produce "some evidence, direct or circumstantial, from which a factfinder would reasonably either: (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Id.* at 413 (quoting *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994)).

Satisfying the first prong requires Farzan to establish that Vanguard's reasons for termination are "not merely wrong, but . . . 'so plainly wrong that [they] cannot have been the employer's real reason[s].'" *Id.* This can be done by demonstrating such "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could rationally find them unworthy of credence." *Id.* (quoting *Keller v. Orix Credit Alliance, Inc.*, 130 F.3d 1101, 1109 (3d Cir. 1997)).

To discredit Vanguard's proffered reasons for termination, Farzan points out he never had a formal performance evaluation (Farzan Aff. ¶ 71); the lack of such an evaluation, however, does not make the reasons unworthy of belief. Corcoran testified Farzan was not employed long enough to receive a formal performance evaluation, and, in any event, he met multiple times with Farzan to review his performance on an informal basis. *See* Corcoran Dep. 40. Further,

9

significant documentary evidence in the record outlines Farzan's perceived shortcomings and the steps taken by both Vanguard and LiquidHub to communicate those concerns to Farzan. *See e.g.*, Farzan Aff. ¶ 62 (acknowledging that Fountaine informed him of Corcoran's concerns regarding his performance); Def.'s Mot. for Summ. J. Ex. S (April 9, 2012, email from Fountaine to Corcoran stating "bringing Ray to your standard is my first priority . . . he is very aware of the seriousness and immediacy needed"); Pl.'s Resp. Ex. 23 (March 30, 2012, email from Peay to Farzan giving suggestions to improve performance).

Farzan also points to an email where Corcoran gave him positive feedback on certain diagrams he produced. According to Farzan, this feedback shows Corcoran was happy with Farzan's work, and Farzan was therefore terminated for discriminatory reasons. As Corcoran testified during his deposition, however, this was but one isolated bit of positive feedback, and the context (even in the same email) shows Corcoran had continuing issues with Farzan's performance. *See* Pl.'s Resp. Ex. 5; Corcoran Dep. 16; *see also Ezold v. Wolf, Block, Schoor and Solis-Cohen*, 983 F.2d 509, 528 (3d Cir. 1992) ("Pretext is not established [because] an employee has received some favorable comments in some categories or has, in the past, received some good evaluations."). In addition, similar and consistent criticisms regarding a lack of leadership and substandard work product were leveled against Farzan by various persons throughout his short term of employment as a senior BSA. Those criticisms reflect a pattern of Farzan's failure to comply with the expectations associated with his position. Isolated bits of positive feedback cannot overcome the many criticisms and concerns voiced by Corcoran, Peay, Richter, and others.

Read in context and as a whole, the documentary evidence and the deposition testimony of those familiar with Farzan's work does not reveal any "weaknesses, implausibilities,

inconsistencies, incoherencies or contradictions" in Vanguard's proffered reasons for termination such that a "reasonable factfinder could rationally find them unworthy of credence." *Jones*, 198 F.3d at 413. Whether Farzan may have disagreed with Vanguard's assessment of his performance is irrelevant as a matter of law. *See Silver v. Am. Inst. Of Cert. Public Accountants*, 212 Fed. App'x. 82, 85 (3d Cir. 2006). It also does not matter if Vanguard was "wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employee is wise, shrewd, prudent or competent." *See Jones*, 198 F.3d at 413. In sum, Farzan has not produced sufficient evidence to refute Vanguard's explanation for his termination, and his claims cannot pass muster under the first prong set forth in *Jones*.

Not only is there insufficient evidence in the record to reasonably conclude Vanguard's articulated reasons for dismissal are unworthy of credence, there is also insufficient evidence for this Court to reasonably infer, under the second *Jones* prong, the adverse employment action was motivated by an invidious discriminatory reason. In order to demonstrate an invidious discriminatory reason motivated the action, "the plaintiff may show that the employer has previously discriminated against [the plaintiff], that the employer has previously discriminated against other persons within the plaintiff's protected class, or that the employer has treated more favorably similarly situated persons not within the protected class." *Jones*, 198 F.3d at 413.

As an initial matter, the record reflects no evidence of any previous discrimination by Vanguard against anyone else at the company, Farzan included, or that other similarly situated persons not in his protected class were treated more favorably. Farzan points to the fact that he was the only Iranian in the group, he was the only male at certain meetings, and Vanguard hired two younger white male BSAs in March 2012 (while Farzan was still employed). Without more,

11

these facts hold no legal significance or probative value. "Statistical evidence of an employer's pattern and practice with respect to minority employment may be relevant to a showing of pretext." *Ezold*, 983 F.2d at 542. Nevertheless, statistics must be accompanied by "analysis of either the qualified applicant pool or the flow of qualified candidates over a relevant time period." *Id.* Without accompanying evidence of this sort, no conclusion can be drawn from the facts presented by Farzan because "raw numbers on underrepresentation . . . are not probative of [an] alleged discriminatory motive." *Id.* (citing *Villanueva v. Wellesley Coll.*, 930 F.2d 124, 131 (1st Cir. 1991) (noting statistics showing small percentage of minority faculty members are "inadequate absent some further indication of their relevance"); *Molthan v. Temple Univ. of Com. Sys. of Higher Educ.*, 778 F.2d 955, 963 (3d Cir. 1985) ("Because the considerations affecting promotion decisions may differ greatly from one department to another, statistical evidence of a general underrepresentation of women in the position of full professor adds little to a disparate treatment claim.")).

Farzan also suggests Vanguard's reasons for terminating him were a pretext for discrimination because Vanguard intended he fail by saddling him with certain burdens and placing insurmountable obstacles in his path. For instance, he claims the equipment he was given was old and faulty, his workload was overwhelming, and he did not receive adequate training. Even assuming each of his complaints is warranted, these conditions do not evidence the existence of invidious discrimination. The nature of Farzan's equipment is irrelevant to the discrimination inquiry without some showing that others, both similarly situated and outside his protected class, were given different or better equipment. *Cf. Solomon v. Soc'y of Auto. Eng'rs*, No. 00-2144, 2001 WL 866974, at *4 (W.D. Pa. July 6, 2001) (granting summary judgment on a sex discrimination claim in which plaintiff cited only his own deposition testimony that women

were given operable computers while he was given an inoperable computer). As for his workload, Farzan cites to Peay's remark that Richter's group was a "demanding bunch." Even if Richter's demands were unreasonable, Peay's comment illustrates Richter imposed those demands on BSAs uniformly, without regard for any of Farzan's protected characteristics. To the extent Farzan claims Richter made it difficult to do his job by leading the meetings herself, Corcoran informed him he would need to be more aggressive with Richter's group and make a concerted effort to take the lead during meetings. Corcoran's advice in this regard also demonstrates that Richter's actions were not based on a protected characteristic or discriminatory animus directed toward Farzan. With respect to any lack of training, Vanguard expected training would not be necessary because explicit in his role as a senior BSA was the requirement that Farzan be able to perform the functions of a BSA with minimal supervision. Any failure to provide training does not suggest a discriminatory motive, but rather confidence that a qualified applicant could handle the advertised demands of the position.

Farzan also focuses on certain isolated comments made by various Vanguard employees to support his contention that discriminatory animus existed at the company and influenced his termination. First, many of these comments were not recalled by or corroborated by anyone other than Farzan. But these factual disputes do not entitle Farzan to a trial because the comments are ultimately immaterial. In order for the comments to serve as probative evidence of discrimination, this Court must consider how and if they are related to the adverse employment action. *See Parker v. Verizon Penn, Inc.*, 309 Fed. App'x. 551, 558-59 (3d Cir. 2009) ("Stray remarks by non-decisonmakers or by decisionmakers unrelated to the decision process are rarely given great weight.") (quoting *Fuentes*, 32 F.3d at 767). The following factors are taken into account when considering stray remarks: "(1) the relationship of the speaker to the

employee and within the corporate hierarchy; (2) the temporal proximity of the statement to the adverse employment decision; and (3) the purpose and content of the statement." *Id.* at 559.

The adverse employment action at issue was Corcoran's decision to remove Farzan from the project, resulting in his termination; thus, any inappropriate remarks made by Corcoran would hold the most significance for Farzan's claims, and Farzan alleges Corcoran made two such comments. The first was a question about the origin of Farzan's name, asked when he first began working for Vanguard. It is undisputed Farzan was not offended by the question, and Corcoran never again broached the subject of his national origin. The Court cannot reasonably infer by this comment that Corcoran held any discriminatory animus when terminating Farzan. The second comment was an off-hand, self-deprecating remark made by Corcoran to a colleague about getting older. The comment was not directed toward Farzan and it also shows no discriminatory animus. That Farzan was temporarily replaced by a younger woman is not, in these circumstances, sufficient to infer that the decision to terminate him was based on Farzan's age. Without producing any facts showing age played any role in the decision to terminate him, his claims cannot survive summary judgment. *See Walters v. Washington County*, 415 Fed. App'x 374, 378 (3d Cir. 2011).

The record also reflects Corcoran's efforts to help Farzan improve and succeed at Vanguard, further undermining any suggestion the adverse employment decision was motivated by discriminatory animus.[8] After performance issues arose, Corcoran contacted Peay and

---

[8] In addition, Corcoran both hired Farzan for the assignment and dismissed him approximately four months later. This fact also undermines any inference of unlawful discrimination. *See Vernon v. A&L Motors*, 381 Fed. App'x 164, 167 (3d Cir. 2010). Fountaine's April 23, 2012, email to Farzan where he wrote of Corcoran: "I wonder if he was just coming up with junk excuses to end the contract" does not cast doubt on the decision. In addition to Fountaine's admitted lack of firsthand knowledge and skewed perception of the quality of Farzan's

encouraged her to continue working with Farzan as a mentor to help improve the situation. *See, e.g.*, Corcoran Dep. 24.  Corcoran also sent two email invitations to meet with Farzan personally and discuss his performance, but both were declined without explanation.  Although Farzan later explained this was a technical issue with the email client, Corcoran had a legitimate grievance when he left Farzan a voicemail expressing his frustration that Farzan was nonresponsive.[9]

The only other comment made by someone who gave feedback on Farzan's performance was by Richter, when she allegedly looked at Farzan and told everyone at a meeting involving the prevention of use of accounts by terrorists that there are no terrorists at Vanguard.  While it is true Farzan may have a cognizable discrimination claim if "those exhibiting discriminatory animus influenced or participated in the decision to terminate," *Abramson v. William Paterson Coll. of N.J.*, 260 F.3d 265, 286 (3d Cir. 2001), Farzan does not contend Richter held any discriminatory animus against him.  There is also no discernable connection between this statement and Richter's evaluation of his performance as a Vanguard BSA, and nothing to suggest discriminatory animus fueled her negative feedback.  Farzan interpreted Richter's comment to imply that others may have believed he was a terrorist, but acknowledged Richter did not hold the same belief.  Even if Farzan's interpretation of the comment's significance was correct, unspecified opinions held by unspecified coworkers in no position to influence the

---

performance, Fountaine acknowledged the email was not intended to imply Corcoran's reasons for termination were based on discrimination or retaliation.  *See* Fountaine Dep. at 15-16.

[9] Farzan also contends that this voicemail constituted harassment, but as explained below, the fact that Farzan considered the voicemail "angry and insulting" does not amount to a cognizable hostile work environment claim.  *See Jensen v. Potter*, 435 F.3d 444, 449 (3d Cir. 2006) (noting that requirements to establish hostile work environment claim "express[] the principle that Title VII is not 'a general civility code for the American workplace.'") (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998)) *overruled in part on other grounds by Burlington N. & Santa Fe Ry. Co. v. White,* 548 U.S. 53 (2006).

adverse employment decision are irrelevant.  None of the other alleged discriminatory comments involved Corcoran or anyone else who could influence Farzan's termination, and thus, those comments are also irrelevant, even if they did in fact occur.  Because there is no evidence suggesting Vanguard terminated Farzan for a discriminatory reason or on the basis of a protected characteristic, Farzan's Title VII and ADEA claims fail.[10]

Farzan also asserts a hostile work environment claim based on alleged harassment associated with the same comments and incidents described above.  A plaintiff can demonstrate a violation of Title VII by proving harassment created a hostile or abusive work environment.  *See Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 66 (1986).  To succeed on such a claim Farzan must prove: "(1) he suffered intentional discrimination on the basis of [a protected characteristic]; (2) the discrimination was severe or pervasive; (3) the discrimination detrimentally affected him; (4) the discrimination would have detrimentally affected a reasonable person in like circumstances; and (5) a basis for employer liability, such as *respondeat superior,* exists."  *McCloud v. United Parcel Serv., Inc.*, 543 F. Supp. 2d 391, 398-99 (E.D. Pa. 2008).

Whether harassment has created a hostile work environment is determined on a case-by-case basis after considering the totality of the circumstances.  *Jensen*, 435 F.3d at 452.  "Offhanded comments[] and isolated incidents (unless extremely serious) are not sufficient to sustain a hostile work environment claim."  *Caver v. City of Trenton*, 420 F.3d 243, 262 (3d Cir. 2005) (internal quotation marks omitted).  Even if harassment is severe or pervasive, "if the reason for that harassment is one that is not proscribed by Title VII, it follows that Title VII

---

[10] Farzan also asserts discrimination claims pursuant to the PHRA, which fail for the same reasons.  *See Fogleman v. Mercy Hosp., Inc.*, 283 F.3d 561, 567 (3d Cir. 2002) (noting "the PHRA is to be interpreted as identical to federal anti-discrimination laws except where there is something specifically different in its language requiring that it be treated differently").

provides no relief." *Jensen*, 435 F.3d at 449.  Applying these principles to the facts at hand, the incidents and comments alleged by Farzan fall far short of establishing an "objectively hostile or abusive work environment." *Harris v. Forklift Sys.,* 510 U.S. 17, 21-22 (1993).  Not only has Farzan failed to establish that any of the comments at issue were in fact discriminatory in nature, the alleged harassment is also insufficiently severe or pervasive to meet the standards governing this claim. Farzan's hostile work environment claim will therefore be dismissed.

Turning last to Farzan's retaliation claim, making out a prima facie case requires evidence that a plaintiff "engaged in activity protected by Title VII; (2) the employer took an adverse employment action against [him]; and (3) there was a causal connection between [his] participation in the protected activity and the adverse employment action." *Moore v. City of Philadelphia*, 461 F.3d 331, 340-41 (3d Cir. 2006).  Although Farzan told Corcoran he would file a complaint if anything happened to his job, there is nothing in the record to suggest Farzan told Corcoran he planned on filing a complaint regarding any perceived discrimination he was experiencing at Vanguard.[11]  His claim therefore fails for two reasons.  First, a conditional threat to file a complaint to preserve job security does not constitute protected activity, since protected activity only includes participation in Title VII proceedings or acts in opposition to discrimination.  *See id.* at 341 (explaining "the anti-retaliation provision of Title VII protects

---

[11] Farzan may have told Fountaine he intended to file a discrimination complaint against Vanguard (although Fountaine denies this). *See* Farzan Aff. ¶ 63; Fountaine Aff. ¶ 2.  It is undisputed, however, that Fountaine never informed anyone at Vanguard of Farzan's intent. *See* Fountaine Aff. ¶ 3.  Thus, even if Farzan may have engaged in protected activity vis–à–vis Fountaine, Farzan cannot establish the required causal link between the adverse employment action taken by Corcoran and Farzan's protected activity.  *See Sanchez v. SunGard Availability Servs*. *LP*, 362 F. App'x 283, 288 ("[B]ecause the individuals who were responsible for deciding to discharge [plaintiff] were unaware of his complaints of discrimination, [plaintiff] has failed to establish a causal connection between his termination and his alleged reporting [of] the discrimination").

those who participate in certain Title VII proceedings . . . and those who oppose discrimination made unlawful by Title VII"); *see also Curay-Cramer v. Ursuline Acad. of Wilmington, Del., Inc.,* 450 F.3d 130, 135 (3d Cir. 2006) (noting opposition to an illegal employment practice must "identify the employer and the practice – if not specifically, at least by context").[12]  Second, even if Farzan's statement to Corcoran was considered protected activity, as discussed above, there is no evidence undermining the credibility of Vanguard's proffered reason for termination, nor is there evidence suggesting Farzan's termination was retaliatory.  Because Farzan cannot show that "the employer's proffered explanation was false, and that retaliation was the real reason for the adverse employment action," his retaliation claim will be dismissed.  *Moore*, 461 F.3d at 342.

No material facts are in genuine dispute as to any of Farzan's claims and Vanguard is entitled to judgment on those claims as a matter of law; Vanguard's motion for summary judgment will therefore be granted and judgment on all claims in Farzan's Complaint will be entered in favor of Vanguard.

An appropriate order follows.

BY THE COURT:

 /s/ Juan R. Sánchez  
Juan R. Sánchez, J.

---

[12] The importance of a requirement to identify the nature of the opposition and the discriminatory practice at issue makes itself apparent in this case, where Farzan ultimately brought claims in connection with every protected characteristic he held, but at least one of which, religion, was not implicated by one fact presented to this Court.  Farzan, having failed to inform anyone at Vanguard he was experiencing discrimination and intended to file a complaint, also has no claim for retaliatory harassment since no one at Vanguard knew of any intent he may have had to oppose any perceived discrimination.  *See Moore*, 461 F.3d at 349 ("An employer may be liable under Title VII for retaliatory harassment perpetrated by an employee's co-workers only if the *prima facie* case is satisfied and if there is a basis for employer liability for the coworker's conduct.").